(Slip Opinion)

# Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f)

The provisions in 26 U.S.C. § 6103 protecting confidentiality of tax returns prohibited the Department of the Treasury from complying with a request by the Chairman of the House Ways and Means Committee for the President's tax returns. The text of section 6103(f), the statutory exception under which the request was made, does not require the Committee to state any purpose for its request. But Congress could not constitutionally confer upon the Committee the right to compel the Executive Branch to disclose confidential information without a legitimate legislative purpose. Under the facts and circumstances, the Secretary of the Treasury reasonably and correctly concluded that the Committee's asserted interest in reviewing the Internal Revenue Service's audits of presidential returns was pretextual and that its true aim was to make the President's tax returns public, which is not a legitimate legislative purpose.

Because section 6103(a) prohibited the disclosure of the tax returns sought in the Chairman's request, as well as in the corresponding subpoenas, the Department of the Treasury's refusal to provide the information did not violate either 26 U.S.C. § 7214(a)(3) or 2 U.S.C. § 192.

June 13, 2019

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF THE TREASURY

The Internal Revenue Code requires that the Department of the Treasury keep tax returns and related information confidential, subject to certain exceptions, and makes the unauthorized disclosure of such information a federal crime. *See* 26 U.S.C. §§ 6103(a), 7213(a). You have asked for our advice about one exception, which provides that the Secretary of the Treasury "shall furnish" tax-return information "[u]pon written request from the chairman of the Committee on Ways and Means of the House of Representatives." *Id.* § 6103(f)(1).

On April 3, 2019, the Chairman of the House Committee on Ways and Means, Representative Richard Neal, requested the last six years of President Trump's individual tax returns, as well as those of eight associated business entities. *See* Letter for Charles P. Rettig, Commissioner, Internal Revenue Service, from Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives at 1–2 (Apr. 3, 2019) ("April 3 Neal Letter"). He also requested the audit histories and work papers associated with each return. *Id.* The Chairman's request, however, did not make any mention of his long-standing campaign to acquire and publish the President's confidential tax returns.

During the prior Congress, Chairman Neal, who was then the Committee's Ranking Member, repeatedly urged the Committee to invoke section 6103(f) to make the President's tax returns "available to the public," declaring that "Committee Democrats remain steadfast in [their] pursuit to have [President Trump's] individual tax returns disclosed to the public." H.R. Rep. No. 115-309, at 8 (2017) (dissenting views); H.R. Rep. No. 115-73, at 8 (2017) (dissenting views). Before the midterm elections, Chairman Neal (as well as other members of his party) promised that, if they won a majority in the House, then the Chairman would wield his authority to demand the President's tax returns.[1]

After becoming Chairman, he followed up on this promise by requesting that the Internal Revenue Service ("IRS") disclose the President's tax returns. In lieu of his prior focus on making the returns public, he asserted that the Committee required six years of President Trump's tax returns because it was "considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President." April 3 Neal Letter at 1. To that end, Chairman Neal claimed that "[i]t is necessary for the Committee to determine the scope of any such examination and whether it includes a review of underlying business activities required to be reported on the individual income tax return." *Id*. The Chairman did not explain why, if the Committee were sincerely interested in understanding how the IRS audits presidential tax returns, he needed to review President Trump's tax returns for many years before his presidency. Nor did the Chairman request any information concerning the IRS's actual policies or practices governing presidential audits or the audit histories for any President other than President Trump.

In view of these marked discrepancies in the public record, Treasury, quite reasonably, concluded that Chairman Neal had not articulated the real reason for his request. The Chairman's request that Treasury turn over the President's tax returns, for the apparent purpose of making them public, amounted to an unprecedented use of the Committee's authority

---

[1] *See* Richard Rubin, *Trump's Tax Returns in the Spotlight if Democrats Capture the House*, Wall St. J., Oct. 3, 2018, https://www.wsj.com/articles/trumps-tax-returns-in-the-spotlight-if-democrats-capture-the-house-1538575880; *see also, e.g.*, John Wildermuth, *Pelosi: Trump's tax returns are fair game if Democrats win House*, S.F. Chron., Oct. 11, 2018, https://www.sfchronicle.com/politics/article/Pelosi-Trump-s-tax-returns-are-fair-game-if-13297954.php (quoting Minority Leader Pelosi: "Demanding the president's tax returns 'is one of the first things we'd do—that's the easiest thing in the world.'").

and raised a serious risk of abuse. As you explained, Treasury was committed to complying with the law, but under the circumstances, it questioned whether the Chairman's request was lawful. Accordingly, you requested this Office's advice about whether Treasury should fulfill the request. *See* Letter for Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, from Brent J. McIntosh, General Counsel, Department of the Treasury at 1 (May 2, 2019).

Given your desire to accommodate the Chairman's deadlines, we agreed to provide our conclusions, with a more detailed opinion to follow. We advised that, although the text of section 6103(f) does not require the Committee to state any purpose for its request, Congress could not constitutionally confer upon itself the right to compel a disclosure by the Executive Branch of confidential information that does not serve a legitimate legislative purpose. *See* Letter for Brent J. McIntosh, General Counsel, Department of the Treasury, from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel at 1 (May 6, 2019) ("Engel Letter"). While the Executive Branch should accord due deference and respect to congressional requests, the Executive need not treat the Committee's assertion of the legitimacy of its purpose as unquestionable. *Id.* The President stands at the head of a co-equal branch of government, and he is separately accountable to the people for the faithful performance of his responsibilities. Treasury thus had the responsibility to confirm for itself that the Chairman's request serves a legitimate legislative end. *Id.*

Under the circumstances, we agreed that it was reasonable to conclude that the Committee's asserted interest in the IRS's audit of presidential returns was pretextual, and that the true aim was to make the President's tax returns public. *Id.* We found strong support for that conclusion in the "manner by which the Committee has conducted its stated investigation, the lack of fit between the requested documents and the proffered reasons, and the many statements by the Chairman and other Members of Congress explaining their purpose for pursuing the tax returns." *Id.* The Supreme Court has made clear that "there is no congressional power to expose for the sake of exposure," *Watkins v. United States*, 354 U.S. 178, 200 (1957), and transmitting information "to inform the public . . . is not a part of the legislative function," *Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979). In the absence of a legitimate legislative purpose, the disclosure of the President's tax returns to the Chairman was barred by section 6103(a) and the Constitution. Engel Letter at 1. This opinion explains the basis for those conclusions.

# I.

## A.

For several decades before 1976, federal tax returns were generally considered "public" records, but they were open to inspection only under regulations or order of the President; while often available to governmental entities, they were nearly always unavailable to the public. *See* 1 Office of Tax Policy, Department of the Treasury, *Report to the Congress on Scope and Use of Taxpayer Confidentiality and Disclosure Provisions* 17–20 (Oct. 2000). By the mid-1970s, Congress had become "increasingly concerned about the disclosure and use of information gathered from and about citizens by [federal] agencies." *Id.* at 20. Government officials had misused tax returns for political purposes, and the absence of genuine confidentiality was thought to impair voluntary compliance with the tax system. *See id.* at 21; *see also* S. Rep. No. 94-938, at 317–18 (1976) (describing questions about "whether the present extent of actual and potential disclosure" presented an "abuse of privacy" that "would seriously impair the effectiveness of our country's very successful voluntary assessment system which is the mainstay of the Federal tax system"); Staff of the Joint Committee on Taxation, *General Explanation of the Tax Reform Act of 1976*, JCS-33-76, at 314 (Dec. 29, 1976) ("Apparently, tax information had been obtained by the White House pertaining to a number of well known individuals for use for non-tax purposes."); 122 Cong. Rec. 24,013 (1976) (statement of Sen. Weicker) (observing that tax returns had become a "generalized governmental asset" and the IRS was acting like a "lending library" to the rest of the government).

In the Tax Reform Act of 1976, Congress established that "[r]eturns and return information shall be confidential, . . . except as authorized by this title." 26 U.S.C. § 6103(a). Returns and return information (collectively, "tax information") are defined broadly.[2] Under this confidentiality

---

[2] Returns are "any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary . . . , and any amendment or supplement thereto." 26 U.S.C. § 6103(b)(1). Return information includes "a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other

rule, government officials with legitimate access to tax information may not disseminate it without additional authorization. A willful unauthorized disclosure is a felony, *see id.* § 7213(a)(1)–(2), and any person who willfully inspects tax information without authorization commits a misdemeanor, *see id*. § 7213A. It is also a felony to willfully solicit tax information, or to willfully "print or publish" it "in any manner not provided by law." *Id.* § 7213(a)(3)–(4). In addition, a taxpayer whose information has been mishandled may seek civil damages against the United States or the private persons responsible in certain circumstances. *Id.* § 7431.

The Secretary and the IRS Commissioner are the "gatekeepers of federal tax information." *Tax Analysts v*. *IRS*, 117 F.3d 607, 613 (D.C. Cir. 1997); *see* 26 U.S.C. § 7801(a)(1) (providing that the Commissioner performs his duties under the Secretary's supervision); Treas. Order No. 150-10 (Apr. 22, 1982) (delegating general authority to administer the tax laws to the Commissioner). The Secretary may prescribe the manner, time, and place for inspection and disclosure, 26 U.S.C. § 6103(p)(1), and must maintain records of such requests, as well as of the returns inspected or disclosed, *id*. § 6103(p)(3). Congress has further imposed strict confidentiality safeguards on all entities that receive tax information. *Id.* § 6103(p)(4).

Congress has identified "thirteen tightly drawn categories of exceptions" to the confidentiality of return information. *EPIC v*. *IRS*, 910 F.3d 1232, 1237 (D.C. Cir. 2018); see 26 U.S.C. § 6103(c)–(o); *see also Congressional Access to Tax Returns Under 26 U.S.C. § 6103(f)*, 1 Op. O.L.C. 85, 90–91 (1977) (noting that section 6103 was "designed to tighten the rules for disclosure" and "to restrict even congressional access to tax information"). Some exceptions are phrased in mandatory terms. *See, e.g.*, 26 U.S.C. § 6103(f)(1), (j)(1) ("the Secretary shall furnish"). Others are permissive. *See, e.g.*, *id*. § 6103(h)(5) ("the Secretary may disclose").

In this matter, Chairman Neal invoked the exception for the congressional tax committees, which provides that, "[u]pon written request" of the Chairman of the House Committee on Ways and Means, the Chairman of the Senate Finance Committee, or the Chairman of the Joint Committee on Taxation, "the Secretary shall furnish such committee with any return or return information specified in such request." *Id.* § 6103(f)(1). If the tax information would identify a particular taxpayer, then it shall be

---

investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return." *Id*. § 6103(b)(2)(A).

disclosed only "in closed executive session" (i.e., out of public view), absent the taxpayer's consent. *Id*. But the three tax committees may submit the tax information to the full Senate or the full House in public session, resulting in public disclosure. *Id*. § 6103(f)(4)(A). This authority differs from that available to other congressional committees, which when authorized by a House or Senate resolution may inspect tax information in closed executive session, *id*. § 6103(f)(3), and may transmit such information to the full House or Senate only in closed executive session, *id*. § 6103(f)(4)(B), preventing public disclosure.

The tax committees often rely upon section 6103(f)(1) to inspect tax information, but such requests typically seek "statistical data to inform the drafting of tax legislation." Letter for Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives, from Steven T. Mnuchin, Secretary of the Treasury at 1 (Apr. 23, 2019) ("April 23 Mnuchin Letter"); *see, e.g.*, Staff of the Joint Committee on Taxation, *Disclosure Report for Public Inspection Pursuant to Internal Revenue Code Section 6103(p)(3)(C) for Calendar Year 2018*, JCX-21-19, at 3 (May 14, 2019) (recording "bulk master file data" disclosures to congressional committees). We have identified only one instance in the four decades since the Tax Reform Act of 1976 when a tax committee publicly disclosed information about specific taxpayers that it had obtained under section 6103(f). In 2014, the Committee investigated allegations of IRS misconduct concerning discrimination against certain conservative organizations in reviewing their tax-exempt status. The Committee obtained tax information about these organizations in connection with its investigation, and some of that information was publicly released when the Committee included it in a criminal referral.[3] There were, however, no indications that the Committee had requested the organizations' tax information for the purpose of publicly disclosing it.

Congressional committees published personally identifiable tax information on three other notable occasions before the 1976 reforms, but in those instances, the Executive Branch released the information voluntari-

---

[3] *See* George K. Yin, *Preventing Congressional Violations of Taxpayer Privacy*, 69 Tax Law. 103, 108–14 (2015); *see also Markup of Referral to the Hon. Eric H. Holder, Jr., Att'y Gen., of Former Internal Revenue Service Exempt Organizations Division Director Lois G. Lerner for Possible Criminal Prosecution for Violations of One or More Criminal Statutes Based on Evidence the Committee Has Uncovered in the Course of the Investigation of IRS Abuses*, H. Comm. on Ways & Means, 113th Cong., at 81 (Apr. 9, 2014) (statement of Rep. Kind) (expressing concern about creating a "very troubling precedent" that the Committee could "start releasing this stuff publicly").

ly. First, in 1924, the Joint Committee on Internal Revenue Taxation sought and obtained tax information about alleged participants in the Teapot Dome scandal. *See* S. Res. 185, 68th Cong., 65 Cong. Rec. 3702 (1924). That information was later published in the *Congressional Record*. *See* 69 Cong. Rec. 9842–43 (1928). The disclosure was made pursuant to a Treasury regulation, not section 6103(f)(4). *See Inspection of Returns*, T.D. 3566, 26 Treas. Dec. Int. Rev. 54, 58 ¶ 13 (1924) ("Inspection of any return shall be afforded to any committee . . . by the Secretary of the Treasury upon application duly made by the chairman of such committee, pursuant to a resolution of Congress or either House[.]").[4] Second, in 1970, information about Students for a Democratic Society that had been obtained under a Treasury regulation was released in a report by the Committee on Internal Security.[5] Third, in 1973, President Nixon chose to release "his tax returns for every year from 1968 to 1972" to the Joint Committee on Internal Revenue Taxation. Joseph J. Thorndike, *JCT Investigation of Nixon's Tax Returns*, Tax Notes, June 13, 2016, at 1527, 1531. The Joint Committee later made public a staff report containing tax information that Nixon had voluntarily disclosed. *Id.* at 1533. Chairman Neal therefore has accurately stated that his request for President Trump's tax information is without any precedent. *See infra* note 17 and accompanying text.

## B.

Chairman Neal's April 3 letter represents the culmination of a sustained effort over more than two years to seek the public release of President Trump's tax returns. During the 2016 presidential campaign, then-candidate Trump chose not to publicly release his tax returns. The President's decision became a campaign issue, with his Democratic opponent charging that "[h]e refuses to do what every other presidential candidate in decades has done."[6]

After the 2016 election, the minority Members of the House continued to press for the President's tax returns. On January 12, 2017, a group of 21 Ranking Members of House committees (including Ranking Member

---

[4] *See also* Yin, *Preventing Congressional Violations of Taxpayer Privacy*, 69 Tax Law. at 121 & n.89.

[5] *See id*. at 136 & n.166.

[6] CNN, *The Situation Room* (television broadcast Aug. 12, 2016), http://www.cnn.com/TRANSCRIPTS/1608/12/sitroom.01.html.

Neal) sent a letter to Speaker Paul Ryan requesting help in obtaining the returns.[7] Three weeks later, Representative Bill Pascrell, Jr., requested that the Ways and Means Committee obtain the President's tax returns under section 6103(f)(1) and then vote in closed session "to submit [them] to the House of Representatives—thereby, if successful, making them available to the public."[8] The refrain was picked up by, among others, Minority Leader Nancy Pelosi, who called for the Committee "to demand Trump's tax returns from the Secretary of the Treasury" and to "hold a committee vote to make those tax returns public."[9] She emphasized the unique authority of the Ways and Means Committee, explaining that "[t]hey can ask for the president's tax returns, and then by a vote in their committee, they can decide where they should be released to the public[.]"[10]

On March 9, 2017, Representative Pascrell introduced a resolution of inquiry that purported to "direct[]" the Secretary under section 6103(f) to provide the House with ten years of President Trump's tax returns, from 2006 through 2015. *See* H.R. Res. 186, 115th Cong. (as introduced, Mar. 9, 2017). Ranking Member Neal was an original co-sponsor of the resolution, which soon acquired 92 co-sponsors, including every Democrat then on the Ways and Means Committee and 19 of the 25 current majority members.[11] On party lines, the Committee reported the resolution

---

[7] Letter for Paul Ryan, Speaker, U.S. House of Representatives, from Elijah E. Cummings, Ranking Member, Committee on Oversight and Government Reform, U.S. House of Representatives, et al. at 6 (Jan. 12, 2017), https://oversight.house.gov/sites/democrats. oversight.house.gov/files/documents/2017-01-12.Ranking%20Members%20to%20 Speaker%20Ryan%20Re.Trump_.pdf.

[8] Letter for Kevin Brady, Chairman, Committee on Ways and Means, U.S. House of Representatives, from Bill Pascrell, Jr., Member, Committee on Ways and Means, U.S. House of Representatives at 2 (Feb. 1, 2017), https://pascrell.house.gov/news/ documentsingle.aspx?DocumentID=2195.

[9] *Transcript of House Democratic Leadership Press Conference at 2017 Issues Conference* (Feb. 8, 2017), https://www.speaker.gov/newsroom/282017/.

[10] Press Conference, Minority Leader Nancy Pelosi, Reacting to Resignation of National Security Advisor Michael Flynn (Feb. 14, 2017), https://www.speaker.gov/ newsroom/2142017/.

[11] *Compare* H.R. Res. 186, 115th Cong. at 1–2 (as reported, Mar. 30, 2017) (listing co-sponsors), *with* H.R. Rep. No. 115-73, at 4 (listing Committee Members in 2017), *and* Chairman Richard Neal, Ways & Means Committee, *Committee Members*, https:// waysandmeans.house.gov/about/committee-members (last visited June 13, 2019) (listing current Committee Members).

unfavorably on March 30, 2017, characterizing it as an "abuse of authority" and "an invasion of privacy." H.R. Rep. No. 115-73, at 3. The Committee explained that section 6103(f) "does not authorize the House of Representatives to receive confidential tax returns and return information from the Secretary of the Treasury, as H. Res. 186 directs." *Id*. at 2–3. Rather, requests under section 6103(f) must be made pursuant to "our legislative responsibility to oversee the tax code." *Id*. at 3. "[T]he purpose of this resolution," however, "is to single out one individual," and, if the resolution were followed, it "would be the first time the Committee exercised its authority to wade into the confidential tax information of an individual with no tie to any investigation within our jurisdiction." *Id*.

Ranking Member Neal and Representative Pascrell filed dissenting views to express "strong[] oppos[ition]" to the unfavorable report. *Id.* at 7–8. They complained that the President had "rebuked over 40 years of tradition and refused to release his individual tax returns to the public." *Id*. They reiterated that, "[s]tarting in February [2017], Committee Democrats began pressing Committee Republicans to use the authority under Section 6103 to obtain President Trump's tax returns and make them available to the public." *Id*. at 8. In their view, the Committee should invoke section 6103(f) to acquire the returns, then use section 6103(f)(4)(A) to submit them "to the House," when, "[p]rocedurally, . . . the tax return and return information would become available to the public." *Id.* They expressed their "sincerest hope that President Trump will release his tax returns to the American public as virtually all presidents have done since Richard Nixon." *Id*. And they proclaimed that "Committee Democrats remain steadfast in our pursuit to have [the President's] individual tax returns disclosed to the public." *Id.*

Throughout the rest of the 115th Congress, House Democrats repeatedly attempted to force the public release of the President's tax returns. On April 5, 2017, Minority Leader Pelosi held another press conference about the President's failure to release his tax returns, at which Ranking Member Neal acknowledged: "This is not about the law, this is about custom and practice. It's a settled tradition [that] candidates reach the level of expectation that they're supposed to release their tax forms."[12] Over the next several months, House Members offered at least a half-dozen privi-

---

[12] *Pelosi Remarks at Press Conference on Demanding a Vote Requiring President Trump to Release Tax Returns* (Apr. 5, 2017) (remarks of Ranking Member Neal), https://www.speaker.gov/newsroom/4517/.

leged resolutions to try to force the release of the tax returns.[13] In July 2017, Representative Pascrell introduced another resolution of inquiry, *see* H.R. Res. 479, 115th Cong. (July 27, 2017), which the Committee reported unfavorably in September 2017, *see* H.R. Rep. No. 115-309, at 4. As with the earlier resolution, the Committee concluded that "[d]irecting the Secretary of the Treasury to now break current law by violating the confidentiality of tax return information is profoundly misguided." *Id.* at 3. Ranking Member Neal and Representative Pascrell again filed dissenting views on behalf of "Committee Democrats" who "remain[ed] steadfast in [their] pursuit to have [the President's] individual tax returns disclosed to the public." *Id.* at 7, 8. During 2018, House Democrats continued to seek the release of the President's tax returns in public statements, letters, and amendments to pending bills.[14]

Shortly before the mid-term elections, Minority Leader Pelosi and Ranking Member Neal promised that they would continue their pursuit of the President's tax returns if their party won a majority in the House. In October 2018, Leader Pelosi stated that "[d]emanding the president's tax returns 'is one of the first things we'd do—that's the easiest thing in the world.'"[15] And Representative Neal said he intended to "get the documents" if he became the Chairman of the Committee.[16] He did, however, express some hesitation about precisely how he would proceed, conceding that "[t]his has never happened before, so you want to be very meticulous."[17] After the Democrats won the majority in the mid-term elections,

---

[13] *See* April 23 Mnuchin Letter app. B, at 8–33; Rep. Bill Pascrell, *President Trump's Tax Returns*, https://pascrell.house.gov/issues/president-trumps-tax-returns/ (last visited June 13, 2019).

[14] *See* April 23 Mnuchin Letter app. B, at 35–37; Rep. Bill Pascrell, *President Trump's Tax Returns*, https://pascrell.house.gov/issues/president-trumps-tax-returns/ (last visited June 13, 2019).

[15] John Wildermuth, *Pelosi: Trump's tax returns are fair game if Democrats win House*, S.F. Chron., Oct. 11, 2018, https://www.sfchronicle.com/politics/article/Pelosi-Trump-s-tax-returns-are-fair-game-if-13297954. php.

[16] *See* Richard Rubin, *Trump's Tax Returns in the Spotlight if Democrats Capture the House*, Wall St. J., Oct. 3, 2018, https://www.wsj.com/articles/trumps-tax-returns-in-the-spotlight-if-democrats-capture-the-house-1538575880.

[17] *Id.*; *see also* Lauren Fox, *Leading Democrat on House Ways and Means would ask for Trump's tax returns*, CNN, Oct. 12, 2018, https://www.cnn.com/2018/10/12/politics/house-ways-mean-tax-retumsrichard-neal/index.html ("'It is not cut and dry,' Neal said, noting that there was still plenty of discussion ahead for how and when to request the returns officially.").

incoming-Speaker Pelosi predicted that the Ways and Means Committee would pursue the tax returns, but she "cautioned that securing them is 'a little more challenging than you might think.'"[18]

To sum up, throughout 2017 and 2018, Chairman Neal and other Members of Congress made clear their intent to acquire and release the President's tax returns. They offered many different justifications for such an action, suggesting that releasing the returns would "honor tradition," show "what the Russians have on Donald Trump," reveal a potential "Chinese connection," inform tax reform legislation, provide the "clearest picture of his financial health," and expose any alleged emoluments received from foreign governments.[19] But oversight of "the extent to which the IRS audits and enforces the Federal tax laws against a President" had never been the focus of their demands. April 3 Neal Letter at 1.

---

[18] John Wagner, *Pelosi says she expects a House committee will 'take the first steps' toward obtaining Trump's tax returns*, Wash. Post, Dec. 13, 2018, https://www. washingtonpost.com/powerpost/pelosi-says-she-expects-a-house-committee-will-take-the-first-steps-toward-obtaining-trumps-tax-returns/2018/12/13/fbc02660-feec-11e8-862a-b6a6f3ce8199_story.html.

[19] *See* April 23 Mnuchin Letter app. A, at 3–4; *see also, e.g.*, *id.* app. B, at 2 (quoting Ranking Member Neal: the tax returns would "help protect against violations of the Emoluments Clause of the Constitution and conflicts of interest, including with foreign adversaries such as Russia"); *id.* app. B, at 7 (quoting Rep. Pascrell: "Why won't Republican members of Congress use their authority in the law to provide oversight and make sure the president and his family are not hiding financial ties that could cause conflicts in the decision-making?"); *id.* app. B, at 8, 11 (quoting resolutions introduced by Reps. Pascrell and Eshoo: "disclosure of the President's tax returns could help those investigating Russian influence in the 2016 election"); *id.* app. B, at 15 (quoting Ranking Member Neal and Rep. Pascrell: "Tax returns provide the clearest picture of a president's financial health" and will allow the public "to gain a more complete understanding of how tax reform will benefit President Trump and his vast business empire."); *id.* app. B, at 19 (quoting Leader Pelosi discussing the "Chinese connection" and explaining, "there's concerns about recent actions by the Chinese government, in relation to the Trump Organization"); *id.* app. B, at 21 (quoting Leader Pelosi: "We think [the returns] will show us some connection that will be useful in the investigation of what do the Russians have on Donald Trump politically, personally, financially."); *id.* app. B, at 22 (quoting Rep. Jeffries: "The release of the President's tax returns will help the American people better understand the extent of Trump's financial ties to Putin's Russia."); *id.* app. B, at 31 (quoting Leader Pelosi: "By blatantly refusing to reveal his tax returns, the President fails to fulfill his promise to the American people, honor tradition, and be transparent about his financial history.").

## C.

After Representative Neal became Chairman, he confirmed that the Committee would pursue the public release of President Trump's tax returns, because "the public has reasonably come to expect that presidential candidates and aspirants release those documents," but he cautioned that "[w]e need to approach this gingerly and make sure the rhetoric that is used does not become a footnote to the court case."[20] On February 7, 2019, the Subcommittee on Oversight held a hearing to consider "whether a President, vice president, or any candidate for these office[s] should be required by law to make their tax return available to the public." *Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns: Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways & Means*, 116th Cong., Serial No. 116-3, at 8 (Feb. 7, 2019) (statement of Subcommittee Chairman Lewis). As one Member explained on television that day, the subcommittee hearing was intended to "lay the foundation for the public purpose to acquire access to these returns."[21]

On April 3, 2019, Chairman Neal announced that the Committee had "completed the necessary groundwork for a request of this magnitude" and that he felt "certain we are within our legitimate legislative, legal, and oversight rights."[22] Two days later, Chairman Neal explained that the Committee had "constructed" a "case" for the tax returns that he hoped "would stand up under the critical scrutiny of the federal courts."[23]

The Chairman explained this "case" in his April 3 letter formally requesting the returns. Invoking 26 U.S.C. § 6103(f), the Chairman requested that, within one week, the IRS produce the President's individual tax returns and those of eight associated business entities for the past six years (tax years 2013 through 2018). April 3 Neal Letter at 1–2. The letter

---

[20] Mark Sullivan, *Powerful Ways and Means chairman Neal to pursue Trump's tax returns*, Telegram & Gazette, Jan. 23, 2019, https://www.telegram.com/news/20190123/powerful-ways-and-means-chairman-neal-to-pursue-trumps-tax-returns. Chairman Neal also stated: "We are now in the midst of putting together the case." *Id.*

[21] MSNBC, *All In with Chris Hayes* (transcript of television broadcast Feb. 7, 2019), http://www.msnbc.com/transcripts/all-in/2019-02-07 (statement of Rep. Dan Kildee).

[22] Chairman Richard Neal, Ways & Means Committee, *Neal Statement on Requesting President Trump's Tax Returns* (Apr. 3, 2019), https://waysandmeans.house.gov/media-center/press-releases/neal-statement-requesting-president-trump-s-tax-returns.

[23] Sunlen Serfaty et al., CNN, *Republicans Warn Trump Tax Request 'Sets A Dangerous Standard' and Accuse Dems of Weaponizing IRS* (Apr. 5, 2019), https://www.cnn.com/2019/04/04/politics/trump-tax-returns-request-republicans-congress/index.html.

also requested information about the returns' audit histories and all associated "administrative files (workpapers, affidavits, etc.)." *Id.* According to the Chairman, "the Committee is considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President." *Id.* at 1. The Chairman recognized that IRS policy subjects every President's individual income tax returns to a mandatory audit. *Id.*[24] He said the requested documents were "necessary" for the Committee "to determine the scope of any such examination and whether it includes a review of underlying business activities required to be reported on the individual income tax return." *Id.* The Chairman did not address what the Committee would do with the tax returns upon their receipt. *See id.* at 1–2.

After the Secretary informed Chairman Neal that he would consult with the Department of Justice about the novel request, the Chairman advised that the Executive could not "second guess the motivations of the Committee or its reasonable determinations regarding its need for the requested tax returns and return information." Letter for Charles P. Rettig, Commissioner, Internal Revenue Service, from Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives at 2 (Apr. 13, 2019) ("April 13 Neal Letter"). In his view, the Committee was entitled to a presumption of regularity and "concerns about what the Committee may do with the tax returns and return information are baseless." *Id.* He set a new deadline of April 23 to "provide the requested tax returns and return information." *Id.*

On April 23, the Secretary informed the Committee that Treasury was continuing its consultations with the Department of Justice and would decide the request by May 6. *See* April 23 Mnuchin Letter at 1. The Secretary noted that the Chairman's section 6103(f) request was "categorically different" from the "overwhelming majority of [congressional] requests for tax return information," which "seek statistical data to inform the drafting of tax legislation." *Id.* Here, by contrast, the Committee "seeks the returns of a single individual taxpayer for an asserted purpose that is at odds with what you and many others have repeatedly said is the request's intent: to publicly release the President's tax returns." *Id.* The Secretary detailed his concerns about the Chairman's interpretation of

---

[24] Under IRS policy since 1977, "[i]ndividual income tax returns for the President and Vice President are subject to mandatory examinations [i.e., audits]." Internal Revenue Manual § 3.28.3.4.3, ¶ 1 (Jan. 1, 2019).

section 6103(f) and the apparently pretextual justification for the request. *Id*. at 4–5. In support, the Secretary attached 47 pages of appendices, which chronicled "a long-running, well-documented effort to expose the President's tax returns for the sake of exposure." *Id*. at 3; *see also id*. apps. A & B. As the Secretary summarized:

> Because Congress may only conduct investigations to further a legitimate legislative purpose, Congressional investigations ordinarily begin with a legislative purpose, and that purpose defines the scope of the documents that are pertinent to the Committee's investigation. But here, by the Committee's own admission, the Committee's investigation began in the opposite direction. The Committee started with the documents it planned to obtain and release (the President's tax returns), and then it sought—in Chairman Neal's words—to "construct[]" a "case" for seeking the documents that would appear to be in furtherance of a legitimate legislative purpose.
>
> The Committee knew that exposure for the sake of exposure would not be a legitimate purpose, and so the Committee could no longer rely upon prior statements to that effect.

*Id*. app. A, at 4–5 (footnotes omitted). Despite those concerns, the Secretary explained that, "[t]o the extent the Committee wishes to understand, for genuine oversight purposes, how the IRS audits and enforces the Federal tax laws against a President," Treasury stood ready to "provid[e] additional information on the mandatory audit process." *Id*. at 5.

On May 6, Treasury formally denied the Committee's request. *See* Letter for Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives, from Steven T. Mnuchin, Secretary of the Treasury at 1 (May 6, 2019) ("May 6 Mnuchin Letter"); Letter for Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives, from Charles P. Rettig, Commissioner of Internal Revenue (May 6, 2019). The Secretary had concluded that the Committee's proffered reason was pretextual. In reliance on this Office's advice, he further concluded that the Committee's true purpose—the public disclosure of the President's tax returns—fell outside Congress's constitutional power of inquiry, and that section 6103(f) would not authorize disclosure. *Id*. The Secretary renewed his "offer to provide information concerning the Committee's stated interest in how the IRS conducts mandatory examinations of Presidents." *Id*.

Four days later, the Committee served subpoenas on the Secretary and the IRS Commissioner seeking the President's tax returns. *See, e.g.*,

Subpoena to the Honorable Steven T. Mnuchin, Secretary, Department of the Treasury, Schedule A (May 10, 2019). In an accompanying letter, Chairman Neal denied the charge of pretext and reiterated his claim that the Committee was conducting oversight related to "the extent to which the IRS audits and enforces the Federal tax laws against a President." Letter for Charles P. Rettig, Commissioner, Internal Revenue Service, and Steven T. Mnuchin, Secretary of the Treasury, from Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives at 2 (May 10, 2019) ("May 10 Neal Letter"). Although the Chairman expressed concern about "the President's ability to influence" the audit process, he rejected the Secretary's offer of an accommodation that would supply information responsive to that concern, stating that information concerning the IRS's audit practices "is not a substitute for the requested tax returns." *Id.* at 3.

On May 17, the Secretary and the IRS Commissioner declined to produce the records in response to the subpoenas based on the earlier conclusion that the Committee lacked a legitimate legislative purpose. *See* Letter for Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives, from Steven T. Mnuchin, Secretary of the Treasury at 1 (May 17, 2019) ("May 17 Mnuchin Letter"); Letter for Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives, from Charles P. Rettig, Commissioner of Internal Revenue at 1 (May 17, 2019) ("May 17 Rettig Letter"). The Secretary had previously "offered to work with the Committee to accommodate its stated interest in understanding how the IRS audits and enforces the Federal tax laws against a President by providing the Committee with additional information on the mandatory audit process." May 17 Mnuchin Letter at 1. But the Committee had declined those offers. The Secretary reiterated that this accommodation "would provide information that directly bears upon what the Committee has stated to be its legislative interest in this subject." *Id*. In a separate letter, the IRS Commissioner provided some of that information in order to inform the Committee that its stated concerns about improper influence on the audit process were unfounded. May 17 Rettig Letter at 1–2.[25]

---

[25] After repeatedly rejecting the Secretary's offered accommodation, Chairman Neal reversed course on May 22 and invited Treasury to provide whatever additional information it chose. *See* E-mail for Office of Legislative Affairs, Department of the Treasury, et al., from Staff Director, Subcommittee on Oversight, Committee on Ways and Means (May 22, 2019) ("It is unclear from the [Department's] letters exactly what type of

## II.

The plain language of 26 U.S.C. § 6103(f)(1) does not require a tax committee to provide any purpose in support of its request for tax information.[26] Yet the Committee has repeatedly labored to justify its request for six years of the President's returns.[27] The Committee's perceived need to articulate such a justification reflects the fact that the Constitution limits the power that Congress may confer upon its agents. Because each House establishes congressional committees solely to carry out its legislative functions, the Committee may request confidential information from the Executive Branch only to further a legitimate legislative purpose.

While the Executive Branch should accord due deference and respect to a committee's request, the Committee's stated purpose in the April 3 letter blinks reality. It is pretextual. No one could reasonably believe that the Committee seeks six years of President Trump's tax returns because of a newly discovered interest in legislating on the presidential-audit

---

additional information Treasury and the IRS intend to provide to [the] Committee. If there are documents or other written materials that Treasury and the IRS would like to provide, please feel free to send those documents to me. If the intent is to provide a briefing, Committee staff is available to meet this week in our offices."). On June 10, senior IRS officials provided the Committee's staff with a three-hour briefing on the presidential audit process, and Treasury offered to continue to address the Committee's stated interest if it had further questions about the audit process. *See* Letter for Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives, from Frederick W. Vaughan, Deputy Assistant Secretary, Office of Legislative Affairs, Department of the Treasury (June 10, 2019).

[26] By contrast, other exceptions under section 6103 do expressly require a showing of purpose. *See, e.g.*, 26 U.S.C. § 6103(d)(1) (permitting disclosure to state tax officials "for the purpose of, and only to the extent necessary in, the administration of [state tax] laws"), (j)(1) (permitting disclosure to certain officials in the Department of Commerce "for the purpose of, but only to the extent necessary in, the structuring of censuses and national economic accounts and conducting related statistical activities authorized by law"), (k)(5) (permitting disclosure to state agencies regulating tax return preparers "only for purposes of the licensing, registration, or regulation of tax return preparers").

[27] *See* April 3 Neal Letter at 1 (stating that the Committee's request was "necessary . . . to determine the scope of any [mandatory presidential audit] examination and whether it includes a review of underlying business activities required to be reported on the individual income tax return"); April 13 Neal Letter at 1 (stating, in response to the Secretary's suggestion that the Committee lacked a legitimate legislative purpose, that the "request is in furtherance of consideration . . . of legislative proposals and oversight related to our Federal tax laws"); May 10 Neal Letter at 1 (subheading: "The Committee Has a Legitimate Legislative Purpose").

process. The Committee's request reflects the next assay in a long-standing political battle over the President's tax returns. Consistent with their long-held views, Chairman Neal and other majority members have invoked the Committee's authority to obtain and publish these returns. Recognizing that the Committee may not pursue exposure for exposure's sake, however, the Committee has devised an alternative reason for the request.

The Committee's request presents a stark legal question. When faced with a congressional request for confidential taxpayer information, must the Secretary close his eyes and blindly accept a pretextual justification for that request? Or must the Secretary implement the statute in a manner faithful to constitutional limitations? We believe that the Executive's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, permits only one answer. Where, as here, there is reason to doubt the Committee's asserted legislative purpose, Treasury may examine the objective fit between that purpose and the information sought, as well as any other evidence that may bear upon the Committee's true objective. In doing so, Treasury acts as part of a politically accountable branch with a constitutional duty to resist legislative intrusions upon executive power and therefore does not act under the same institutional constraints as the Judiciary. Here, because the Committee lacked a legitimate legislative purpose, its request did not qualify for the statutory exception to taxpayer confidentiality, and the law required Treasury to deny that request.

## A.

Congress granted the Ways and Means Committee the authority to obtain confidential tax information under section 6103(f). It is axiomatic, however, that "Congress cannot grant to an officer under its control what it does not possess." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986). The Committee's authority under section 6103(f) therefore may not exceed the constitutional limitations on congressional power, which require that any committee investigation must serve a legitimate legislative purpose.

The Constitution vests certain "legislative Powers" in Congress. U.S. Const. art. I, § 1. Those legislative powers do not expressly include the "power to investigate," but such a power is "inherent in the power to make laws." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975); *see also McGrain v. Daugherty*, 273 U.S. 135, 161 (1927) ("In actual legislative practice, power to secure needed information . . . has long been treated as an attribute of the power to legislate."). Thus, "Con-

gress may conduct investigations in order to obtain facts pertinent to possible legislation and in order to evaluate the effectiveness of current laws." *Scope of Congressional Oversight and Investigative Power with Respect to the Executive Branch*, 9 Op. O.L.C. 60, 60 (1985); *see also Quinn v. United States*, 349 U.S. 155, 160 (1955) (the investigative power is "co-extensive with the power to legislate"). Congress's investigative authority also "comprehends probes into departments of the Federal Government to expose corruption, inefficiency, or waste." *Watkins v. United States*, 354 U.S. 178, 187 (1957). But this "power to investigate must not be confused with any of the powers of law enforcement." *Quinn*, 349 U.S. at 161.

The Supreme Court further has made clear that, "broad as is this power of inquiry, it is not unlimited," because any congressional inquiry "must be related to, and in furtherance of, a legitimate task of the Congress." *Watkins*, 354 U.S. at 187; *see Eastland*, 421 U.S. at 504 n.15 (the "boundaries" of Congress's power to investigate "are defined by its source"); *Barenblatt v. United States*, 360 U.S. 109, 111 (1959); *see also* Alissa M. Dolan et al., Cong. Research Serv., RL30240, *Congressional Oversight Manual* 25 (Dec. 19, 2014) ("A committee's inquiry must have a legislative purpose or be conducted pursuant to some other constitutional power of Congress[.]"). As relevant here, the Court has articulated one significant constraint on Congress's investigative powers. "[T]here is no congressional power to expose for the sake of exposure." *Watkins*, 354 U.S. at 200. In other words, "there is simply 'no general authority to expose the private affairs of individuals without justification in terms of the functions of Congress.'" *Doe v. McMillan*, 412 U.S. 306, 330 (1973) (quoting *Watkins*, 354 U.S. at 187); *see also, e.g.*, *Quinn*, 349 U.S. at 161 ("[T]he power to investigate . . . . cannot be used to inquire into private affairs unrelated to a legislative purpose."); *McGrain*, 273 U.S. at 173 ("[N]either house is invested with 'general' power to inquire into private affairs and compel disclosure[.]"); *Kilbourn v. Thompson*, 103 U.S. 168, 190 (1880) (neither the House nor the Senate "possesses the general power of making inquiry into the private affairs of the citizen").

Although Congress's investigative authority is sometimes described as including a so-called "informing function," that function is merely "the power of the Congress to inform *itself*" of the facts needed to carry out legislative affairs. *Watkins*, 354 U.S. at 216 (emphasis added). The informing function does not grant Congress an independent authority to obtain and publicize confidential information. As the Court has made clear, "[v]aluable and desirable as it may be in broad terms, the transmit-

tal of such information . . . in order to inform the public . . . is not a part of the legislative function." *Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979); *see Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 531 (9th Cir. 1983) ("The 'informing function' of Congress is that of informing itself about subjects susceptible to legislation, not that of informing the public."); *McSurely v. McClellan*, 553 F.2d 1277, 1285–86 (D.C. Cir. 1976) (en banc) ("disseminat[ing] to the public beyond 'the legitimate legislative needs of Congress'" is not encompassed within Congress's "legislative activity"). The Court has therefore explained that "neither the investigatory nor, indeed, the informing function of Congress authorizes any 'congressional power to expose for the sake of exposure.'" *McMillan*, 412 U.S. at 330 (quoting *Watkins*, 354 U.S. at 200). And this Department has issued an opinion making the same point, observing that "Congress's legislative function does not imply a freestanding authority to gather information for the sole purpose of informing 'the American people.'" *Assertion of Executive Privilege over Documents Generated in Response to Congressional Investigation into Operation Fast and Furious*, 36 Op. O.L.C. __, at *7 (June 19, 2012) (opinion of Attorney General Eric H. Holder, Jr.).

Because Congress may not authorize its agents to wield powers in excess of its own, section 6103(f) could not confer upon a tax committee a right to obtain confidential information that did not serve a legitimate legislative purpose. Congress could enact legislation that makes tax returns available to the public at large, but it has chosen instead to make them confidential and to prohibit Treasury from releasing them to unauthorized persons. Lacking any role in implementing the laws itself, Congress may confer upon its agents a right to request and receive confidential information only to the extent necessary to serve a legitimate legislative end. *See Bowsher*, 478 U.S. at 733–34 ("[O]nce Congress makes its choice in enacting legislation, its participation ends. Congress can thereafter control the execution of its enactment only indirectly—by passing new legislation."). Therefore, despite the mandatory language of section 6103(f), we believe that the Constitution requires that the Committee establish a legitimate legislative purpose in support of its request for the President's tax returns.[28]

---

[28] The Congressional Research Service apparently agrees with this conclusion. *See* David H. Carpenter et al., Cong. Research Serv., LSB10275, *Congressional Access to the President's Federal Tax Returns* 2 (updated May 7, 2019) (recognizing that, despite the "plain language of Section 6103(f)," requests for tax returns under that provision "must

### B.

While implicitly recognizing the need for a legislative purpose, Chairman Neal contends that the Executive may not "question or second guess" the Committee's "reasonable determinations regarding its need for the requested tax returns and return information." April 13 Neal Letter at 2. But the same constitutional limitations that constrain the Committee's investigative authority prevent the Executive from treating the Chairman's word on the matter as unquestionable. Just as Congress may not empower its agents to exceed the boundaries of legitimate legislative power, an assertion from a committee chairman may not prevent the Executive from confirming the legitimacy of an investigative request. Were it otherwise, the Secretary of the Treasury would effectively be delegating his own obligation to faithfully execute the laws to the committee chairman.

Section 6103 charges the Secretary with the "duty of protecting return information from disclosure to others *within the federal government*, and to the public at large." *Tax Analysts v. IRS*, 117 F.3d 607, 613 (D.C. Cir. 1997) (emphasis added). Treasury is the repository of federal tax information, which consists largely of returns "filed with the Secretary," 26 U.S.C. § 6103(b)(1), and other information "received by, recorded by, prepared by, furnished to, or collected by the Secretary," *id.* § 6103(b)(2)(A). The Secretary is also charged with disclosing return information to those authorized to receive it. The exceptions to the general rule of taxpayer confidentiality are themselves phrased as instructions to "[t]he Secretary" (and his delegees). *Id.* § 6103(c)–(o). Thus, the Secretary must decide, in the first instance, whether a request meets the "preconditions" for any exception, and, if so, how to exercise his statutory authority. *EPIC v. IRS*, 910 F.3d 1232, 1242 (D.C. Cir. 2018). The statutory scheme would make little sense (and would provide scant guarantee of taxpayer confidentiality) if a requester were the sole arbiter of whether an exception had been satisfied.

This framework remains the same no matter whether the relevant limit on the request flows from the statute or from the Constitution. The need for Treasury to exercise judgment in making those decisions is necessarily at its peak when deferring to the request would effectively surrender the Executive's obligations to a Member of Congress. When separating powers under the Constitution, the Founders' "primary fears were directed

---

further a 'legislative purpose' and not otherwise breach relevant constitutional rights or privileges").

toward congressional self-aggrandizement." *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 131 (1996); *see also Mistretta v. United States*, 488 U.S. 361, 411 n.35 (1989) (noting the "special danger recognized by the Founders of congressional usurpation of Executive Branch functions"). The tripartite structure of the federal government was intended to act as a "self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Buckley v. Valeo*, 424 U.S. 1, 122 (1976) (per curiam). Thus, Congress and its agents are forbidden from exercising authority beyond the legislative process and "from intervening in the decision making necessary to execute the law." *The Constitutional Separation of Powers*, 20 Op. O.L.C. at 131.

Allowing a congressional committee to dictate when Treasury must keep tax information confidential and when it must disclose such information would impermissibly intrude on executive power by ceding control to the Committee over ensuring that section 6103 is implemented in a manner consistent with the constitutional limitations. *See, e.g.*, *Bowsher*, 478 U.S. at 733–34 (declaring unconstitutional a statute purporting to allow the Comptroller General, a congressional agent, to "command[] the President himself to carry out . . . the directive of the Comptroller General"). In order to comply with the duty to faithfully execute the laws, U.S. Const. art. II, § 3, and to protect the Executive against legislative encroachments, Treasury must have the authority to determine whether a congressional request to disclose confidential tax information under section 6103(f) is within the appropriate scope of Congress's constitutional authority, and in particular, whether the request has been made in furtherance of a legitimate legislative purpose.

This approach to section 6103 is consistent with how the Executive Branch addresses congressional requests for information in connection with congressional oversight. This Office has long advised that "a threshold inquiry that should be made [by the Executive] upon receipt of *any* congressional request for information is whether the request is supported by any legitimate legislative purpose." *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 74 (1986) (emphasis added). As then-Assistant Attorney General William Barr explained, the Executive Branch will assess its "interest in keeping [requested] information confidential" only after "it is established that Congress has a legitimate legislative purpose for its oversight inquiry." *Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 154 (1989). As a

result, "Congress' duty to articulate its need for particular materials—to 'point[] to . . . specific legislative decisions that cannot responsibly be made without access to materials uniquely contained in' the privileged document it has requested"—is a mainstay of the accommodation process. *Id.* at 159 (quoting *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 733 (D.C. Cir. 1974) (en banc)); *see also Assertion of Executive Privilege in Response to a Congressional Subpoena*, 5 Op. O.L.C. 27, 31 (1981) (opinion of Attorney General William French Smith) (describing the Executive Branch's obligation to accommodate "[i]n cases in which the Congress has a legitimate need for information that will help it legislate").

In many circumstances, Treasury will not need to engage in close scrutiny of a congressional committee's request under section 6103(f), because the underlying, legitimate purpose will be self-evident. But the separation of powers dictates that a congressional request cannot require the agency to close its eyes to overwhelming evidence that a congressional committee's stated purpose is a pretext for an illegitimate one. If a committee does not provide any purpose to justify its request, then Treasury may request that the committee provide one. Given the criminal penalties for the unauthorized and willful inspection or disclosure of tax information, *see* 26 U.S.C. §§ 7213, 7213A, Treasury officials are within their rights to assure themselves that any disclosures are appropriately authorized.

That Treasury has the duty to implement section 6103 in a manner consistent with constitutional limitations should hardly generate controversy. Indeed, this approach is not only consistent with the constitutional separation of powers, but it also furthers the purposes underlying section 6103 itself. Congress reformed the system of taxpayer confidentiality in 1976 precisely to prevent the kinds of politically motivated abuses of authority that Congress feared would compromise the integrity of the federal tax-return system. *See, e.g.*, S. Rep. No. 94-938, at 317. Treasury's review of a congressional committee request, particularly one involving personally identifiable tax information, helps ensure against any breaches of those protections for the personal privacy of taxpayers.

## C.

In urging Treasury not to "second guess" the Committee's request for the President's tax returns, Chairman Neal contends that "the Supreme Court has consistently noted that the motivations underlying Congres-

sional action are not to be second guessed, *even by the courts*." April 13 Neal Letter at 2 (emphasis added). That assertion rests upon a misunderstanding of the Court's precedents. The courts have never abdicated their responsibility to review the authority underlying the congressional subpoena. But even where courts have expressed reluctance to probe congressional motivations in political disputes, they have done so for reasons that do not apply to review by the Executive Branch. Simply deferring to Congress's assertions would constitute an abdication of the Executive Branch's own constitutional responsibilities.

The Supreme Court has specifically rejected the proposition that a court may not police the boundaries of congressional inquiries. In *Watkins*, for example, the Supreme Court declined to "assume . . . that every congressional investigation is justified by a public need that overbalances any private rights affected." 354 U.S. at 198. The House Un-American Activities Committee had claimed to be inquiring into Communist infiltration in labor. *Id.* at 212–14. But the Court found otherwise. After "[l]ooking at the entire hearings," it found "strong reason to doubt that the subject revolved about labor matters," noting that the title of the published transcript referred to "Communist Activities" without any reference to labor, and that "six of the nine witnesses had no connection with labor at all." *Id.* at 213. Significantly, the Court rejected the committee's argument that its inquiry must be sustained so long as there *could* have been any legislative purpose to support the committee's inquiry. *Id.* at 204.

Similarly, in *Kilbourn*, although Congress asserted a purpose for its investigation (enforcing the payment of a debt), the Court did not treat that asserted purpose as conclusive. Instead, the Court examined the House resolution and concluded that the committee's purpose was not a valid *legislative* purpose because it was more judicial in nature. 103 U.S. at 194. And in *United States v. Rumely*, 345 U.S. 41 (1953), the Court affirmed the reversal of a conviction for contempt of Congress because the Court refused to read a committee's authority to investigate lobbying activities as extending to an individual who did not directly lobby Congress. *Id.* at 47. And it did so even though the resolution authorizing the inquiry and the Chairman's statement of purpose "ma[de] plain" that the committee sought "to probe the sources of support of lobbyists," including those who sought to influence "directly *or indirectly*, the passage or defeat of any legislation by the Congress," *id.* at 53–54 (Douglas, J., concurring) (emphasis added). The Court refused to be "that blind court . . . that does not see what all others can see and understand" and does not "know that there is wide concern, both in and out of Congress, over some

23

aspects of the exercise of the congressional power of investigation." *Id.* at 44 (internal quotation marks and brackets omitted).

Moreover, when affirming the legitimacy of legislative purposes, courts have sometimes noted that there had not been any suggestion of a potentially improper purpose. In *McGrain*, for instance, the Court inferred from Senate resolutions that an investigation's object was "to obtain information for legislative purposes," but the Court expressly noted that "[i]t is not as if an inadmissible or unlawful object were affirmatively and definitely avowed" in the authorizing resolutions or committee proceedings. 273 U.S. at 177, 180. And in *United States v. American Telephone & Telegraph Co.*, 551 F.2d 384 (D.C. Cir. 1976), the court observed that the parties conceded that a House subcommittee was "inquiring into a suitable area of federal legislation," and expressly noted the absence of any "allegation that Congress is seeking to 'expose for the sake of exposure.'" *Id.* at 393 (quoting *Watkins*, 354 U.S. at 200).

Where courts have declined to engage in searching inquiries about congressional motivation, they have phrased their reluctance in terms of the institutional limits on the Judicial Branch. As the Supreme Court has explained: "In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses." *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951) (footnote omitted). As a result, "*courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province.*" *Id.* (emphasis added); *see also, e.g.*, *Watkins*, 354 U.S. at 200 ("Such is not *our* function.") (emphasis added); *Barenblatt*, 360 U.S. at 132 ("So long as Congress acts in pursuance of its constitutional power, *the Judiciary* lacks authority to intervene on the basis of the motives which spurred the exercise of that power." (emphasis added)); *Eastland*, 421 U.S. at 509 ("The wisdom of congressional approach or methodology is not open to *judicial* veto.") (emphasis added).[29]

---

[29] A district court recently applied the same judicial presumption in declining to block the enforcement of a different House committee's subpoena to Mazars USA LLP, an accounting firm, for financial records relating to President Trump and associated business entities. *See Trump v. Comm. on Oversight & Reform of the U.S. House of Representatives*, No. 19-cv-1136, 2019 WL 2171378 (D.D.C. May 20, 2019), *appeal docketed*, No. 19-5142 (D.C. Cir. May 21, 2019). The district court recognized that Congress's investigative powers have limits, and that there is no congressional authority to expose for the

The Court's decisions in this area rest upon institutional constraints on the Judiciary that militate in favor of deference to the decisions of the political branches of government. Absent a threat to an identified constitutional right, "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018) ("Given the standard of review, it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny."); *Marshall Field & Co. v. Clark*, 143 U.S. 649, 673 (1892) (deeming "forbidden by the respect due to a coördinate branch of the government" "[j]udicial action" requiring a belief in a "deliberate conspiracy" by the Senate and House of Representatives "to defeat an expression of the popular will").

Separated from the democratic process, the federal courts are not well equipped to second-guess the action of the political branches by close scrutiny of their motivations. This is why the Supreme Court has recognized that, so long as Congress "acts in pursuance of its constitutional power, *the Judiciary* lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt*, 360 U.S. at 132 (emphasis added). "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Beach Communications*, 508 U.S. at 314 (internal quotation marks and citation omitted).

These same limitations do not apply to the Executive Branch, which operates as a politically accountable check on the Legislative Branch. The Founders separated the President from the Congress, giving him "a separate political constituency, to which he alone was responsible," and "the means to resist legislative encroachment" upon his duty to execute the laws. *Freytag v. Comm'r*, 501 U.S. 868, 906 (1991) (Scalia, J., concurring

---

sake of exposure. *Id*. at *9. Yet the district court reasoned that "[w]hen a court is asked to decide whether Congress has used its investigative power improperly, its analysis must be highly deferential to the legislative branch." *Id*. Whether or not the district court correctly applied this presumption in a case involving a congressional subpoena to a private party, its posture of deference does not bear upon our conclusion that Treasury, as part of a co-equal political branch, has an independent duty to determine accurately whether the Committee's section 6103(f) request furthers a legitimate legislative purpose.

in part and concurring in the judgment); *see also The Constitutional Separation of Powers*, 20 Op. O.L.C. at 128 (explaining that the Executive's "independent constitutional obligation to interpret and apply the Constitution" is "of particular importance in the area of separation of powers, where the issues often do not give rise to cases or controversies that can be resolved by the courts . . . due in part to the limits of jurisdiction and justiciability"). The head of the Executive Branch, who is elected separately from Congress, ultimately must answer to the people for the manner in which he exercises his authority. The separation of powers would be dramatically impaired were the Executive required to implement the laws by accepting the legitimacy of any reason proffered by Congress, even in the face of clear evidence to the contrary. In order to prevent the "special danger . . . of congressional usurpation of Executive Branch functions," *Mistretta*, 488 U.S. at 411 n.35, we believe that Treasury must determine, for itself, whether the Committee's stated reason reflects its true one or is merely a pretext.

## III.

Applying the foregoing legal framework, we concluded that the Secretary reasonably and correctly found that the Committee lacked a legitimate purpose for seeking six years of the President's tax information. The Committee's asserted purpose—to consider legislation regarding the IRS's practices in auditing presidential tax filings—was implausible. The objective mismatch between the Committee's stated purpose, on the one hand, and the particular information that the Committee demanded, on the other, provided strong evidence of pretext. In addition, the nature of the request, the long series of events that preceded it, and Chairman Neal's pointed failure to renounce his oft-proclaimed purpose of publicly releasing the President's tax returns all confirm that the Committee's purpose was the constitutionally impermissible one of forcing the public disclosure of the President's tax returns.

## A.

According to Chairman Neal, the Committee requested President Trump's tax information to "consider[] legislative proposals and conduct[] oversight related to our Federal laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President." April 3 Neal Letter at 1. To achieve that purpose, he reasoned, "[i]t is necessary for the Committee to determine the scope of

any such examination and whether it includes a review of underlying business activities required to be reported on the individual income tax return." *Id*. The Committee therefore claimed to be interested in the IRS's conduct of audit policy, not the President's underlying business affairs. But the Committee had requested the individual returns of Donald J. Trump and those of eight associated business entities for the past six years (2013 through 2018); information related to audits of any of those returns; and all administrative files for those returns. *Id*. at 1–2.

Although a review by the Committee of the IRS's performance of its duties would appear, on its face, to be an example of routine oversight, *see Watkins*, 354 U.S. at 187, we agree with the Secretary that the Committee's request does not objectively "fit" this stated purpose. April 23 Mnuchin Letter at 4. First, many of the requested documents are barely relevant to reviewing the IRS's auditing of the President's tax returns. The tax returns themselves precede any audit and do not include any information about the audit processes. At the same time, as the Secretary repeatedly noted, the Committee had expressed no interest in the actual IRS documents that would provide the best evidence of its policies and procedures relating to presidential audits. If the Committee were sincerely interested in IRS policies and practices, then it surely would have started by requesting that Treasury provide information about those policies. As the Secretary explained, "[a]lthough the IRS has conducted mandatory examinations of Presidents' tax returns since 1976, the Committee does not request additional information about those policies or ask whether those policies and procedures have changed over time." *Id.*[30] Senator Grassley, who as Chairman of the Senate Finance Committee has the same powers as Chairman Neal under section 6103(f), made precisely the same point: "If Democrats are truly interested in finding out the level of scrutiny given to a President's tax returns, why not simply just ask the IRS to describe its audit procedure? That is a very straightforward question[.]" 165 Cong. Rec. S2259 (daily ed. Apr. 4, 2019).

While the Committee requested the "administrative files" accompanying the President's tax returns, which would include audit-related information, Chairman Neal's press release mentioned only the President's tax returns in its title ("Neal Statement on Requesting President Trump's Tax Returns"), mentioned the returns three additional times in its text, and

---

[30] Indeed, it was not until after Treasury had denied both the Committee's request and the follow-on subpoenas that the Committee's staff agreed to receive a briefing from Treasury supplying such information. *See supra* note 25.

never addressed the other documents. *See supra* note 22. The Committee's lack of interest in the IRS's audit policies and procedures, or in the audits themselves, speaks volumes.

Second, the Committee requested six years of the President's tax returns, but only the last two years correspond to his time in office. Chairman Neal was candid in stating that he would have gone back even further, but he believed such a judgment would be hard to defend in court. According to Chairman Neal, "[t]he six-year decision was reached *because the IRS advises you should retain six years of your tax records. . . .* And we thought if this were to end up in court we didn't want an issue, for example if you were requesting eight years, where it would be thrown out based on a technicality."[31] Although Chairman Neal's concern for a taxpayer's retention of his records would not seem to have any bearing upon a request directed towards the IRS, what is perfectly clear is that his stated rationale had no connection at all with the IRS audit procedures supposedly under investigation. Nor does his reason for choosing six rather than eight years reflect any interest in *presidential* tax returns, as Donald Trump was not President in 2011, any more than he was in 2013 or 2016.

Third, the Committee's exclusive focus on a single taxpayer, President Trump, belies its stated interest in investigating an IRS audit program that has applied to all Presidents and Vice Presidents since 1977. Chairman Neal justified the Committee's exclusive interest in President Trump on the ground that he is "unique," owing to the "volume of his tax returns" and his businesses. May 10 Neal Letter at 2. But it seems doubtful that the Committee, if it genuinely sought to evaluate the effectiveness of IRS's presidential-audit program, would decide at the outset to rely on a sample consisting of only one conceded outlier.

Furthermore, audits take time. By limiting itself to the returns of "the only President for whom the audit process necessarily remains ongoing," April 23 Mnuchin Letter at 4, the Committee simply increased the chances that it would see fewer completely audited returns than it would if it had included, say, those for President Obama and Vice President Biden between 2013 and 2016. Focusing on older presidential and vice presidential returns would also have been more consistent with IRS policy by

---

[31] Erica Werner, Damian Paletta, and Jeff Stein, *White House maneuvers to block release of Trump's tax returns*, Wash. Post, Apr. 4, 2019, https://www.washingtonpost.com/business/economy/white-house-maneuvers-to-block-release-of-trumps-tax-returns/2019/04/04/047b19e0-56f4-11e9-8ef3-fbd41a2ce4d5_story.html (emphasis added).

avoiding potential interference with any current audit activities. *See* Internal Revenue Manual § 11.3.4.4, ¶ 13 (Jan. 1, 2019) (providing that "[r]ecords relating to cases that are under active investigation may be disclosed if, in the opinion of the appropriate functional head, no serious adverse effect on the administration of the tax laws will result from disclosure of the open case records"). By choosing an unrepresentative sample of presidential and vice presidential returns, the Committee made it even less likely that the Committee could learn anything bearing upon legislative changes to the IRS's program. Nor, with information about only one person and his businesses, would the Committee even begin to be able to assess whether the IRS's policies and procedures are being applied in an evenhanded manner in the presidential-audit program.

Thus, an objective assessment of the request confirms the Secretary's observation that "the terms of the Committee's request" did not "fit the Committee's asserted purpose" of investigating "the extent to which the IRS audits and enforces the Federal tax laws against a President." April 23 Mnuchin Letter at 4.

## B.

At the same time, the Committee's request appeared to be "perfectly tailored" to accomplish the Chairman's long-standing and avowed goal, namely "to obtain and expose the President's tax returns." April 23 Mnuchin Letter at 4. As explained above, Chairman Neal and other Members have engaged in a prolonged campaign to force public disclosure, repeatedly urging the Committee to invoke section 6301(f) to serve that cause. They pledged to "remain steadfast in [their] pursuit of" public disclosure of the returns. H.R. Rep. No. 115-309, at 8 (dissenting views); H.R. Rep. No. 115-73, at 8 (dissenting views). They made the promised disclosure a recurring issue and, after the election, pledged to accomplish that goal.

During these political debates, Chairman Neal and his political allies asserted many reasons for reviewing the President's tax returns, *see supra* note 19 and accompanying text, yet many of them would fall outside the jurisdiction of the Ways and Means Committee, which is the only House committee that could release the returns to the public. By contrast, the Ways and Means Committee does have jurisdiction to review IRS audit practices. On April 5, Chairman Neal candidly acknowledged that the Committee had sought to "construct[]" a "case" for acquiring the returns that would "stand up under the critical scrutiny of the federal courts." *See*

*supra* note 23. That is transparently the reason why the Committee now claims an interest in presidential-audit practices.

In his correspondence with Treasury, Chairman Neal asserted that any "concerns about what the Committee may do with the tax returns . . . are baseless." April 13 Neal Letter at 2. But his letter did not deny the Committee's plan. Chairman Neal said only that Treasury "must assume that the Committee Members . . . will act properly in the conduct of their official duties." *Id.* He neither made any promises against publicly releasing the tax returns nor renounced his previously "steadfast" "pursuit" of their public release. We do not disagree that a committee may make "a valid legislative inquiry" even though there is "no predictable end result" as to where the investigation would lead. *Id.* (quoting *Eastland*, 421 U.S. at 509). But congressional investigations must start with a legitimate subject of inquiry. By contrast, here, as the Secretary recognized, the Committee began precisely "in the opposite direction" by deciding the documents it sought to obtain and seeking, "in Chairman Neal's words— to 'construct[]' a 'case' for seeking the documents." April 23 Mnuchin Letter app. A, at 4. There is one and only one "predictable end result" of the Committee's inquiry: the public exposure of the President's tax returns.

Under the circumstances, we do not believe that Treasury was required to "blind" itself to the "wide concern, both in and out of Congress," about the nature of the Committee's request. *Rumely*, 345 U.S. at 44 (internal quotation marks omitted); *see also* 165 Cong. Rec. S2260 (daily ed. Apr. 4, 2019) (statement of Sen. Grassley) (concluding that the April 3 request was "very, very short" of "hav[ing] a legitimate legislative purpose"); Letter for Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives, from Kevin Brady, Ranking Member, Committee on Ways and Means, U.S. House of Representatives (May 10, 2019) ("[I]t has become obvious that your supposed legislative purpose is just a pretext, and your request is merely a means to access and make public the tax returns of a single individual for purely political purposes. This is not a legitimate legislative purpose[.]") (footnote omitted). The openly partisan nature of this dispute would understandably make the courts wary of interceding.[32] But Treasury had no such choice. It could

---

[32] *Cf. Raines v. Byrd*, 521 U.S. 811, 833 (1997) (Souter, J., concurring in judgment) (noting that judicial intervention in disputes between the political branches "risk[s] damaging the public confidence that is vital to the functioning of the Judicial Branch . . . by embroiling the federal courts in a power contest nearly at the height of its political

not abstain or declare the matter nonjusticiable. It was required to faithfully carry out its duties, either by releasing the tax information in response to a legitimate request or by maintaining its confidentiality under section 6103(a). There could be no middle ground.

For all the foregoing reasons, we believe that the Secretary reasonably and correctly concluded that the Committee's stated purpose was pretextual and its actual purpose was simply to provide a means for public disclosure of the President's tax returns. Given that Congress may not pursue public disclosure for its own sake, *see, e.g.*, *Hutchinson*, 443 U.S. at 133; *McMillan*, 412 U.S. at 330; *Watkins*, 354 U.S. at 200, disclosure was not authorized under section 6103(f), and section 6103(a) therefore required Treasury to maintain confidentiality of the requested tax information.

## IV.

Because section 6103(a) prohibited the disclosure of the tax returns sought in Chairman Neal's April 3 request, as well as in the corresponding subpoenas, Treasury's refusal to provide the information did not violate either 26 U.S.C. § 7214(a)(3) or 2 U.S.C. § 192.

Under 26 U.S.C. § 7214(a)(3), it is a crime for "[a]ny officer or employee of the United States acting in connection with any revenue law of the United States" to "fail[] to perform any of the duties of his office or employment" "with the intent to defeat the application of any provision" of the Internal Revenue Code. Treasury's denial to the Committee of the requested information did not violate that statute. Far from a *failure* to perform any "duties" in connection with the revenue law, the Secretary and other officials at Treasury faithfully implemented their duties under section 6103(a) in response to a request for a disclosure that would not be authorized under section 6103(f). In addition, given the statute's intent requirement, they did not act with an "intent to defeat the application of" section 6103(f), when they acted in good faith after consulting with you and with this Office.

---

tension"); *Goldwater v. Carter*, 444 U.S. 996, 1004 (1979) (Rehnquist, J., concurring in the judgment) (explaining that case was nonjusticiable because, among other things, "we are asked to settle a dispute between coequal branches of our Government, each of which has resources available to protect and assert its interests, resources not available to private litigants outside the judicial forum"); *Gravel v. United States*, 408 U.S. 606, 640 (1972) (Douglas, J., dissenting) ("The federal courts do not sit as an ombudsman refereeing the disputes between the other two branches.").

For similar reasons, Treasury officials did not violate the contempt-of-Congress provision, 2 U.S.C. § 192, by failing to turn over confidential records in response to a Committee subpoena that lacks a valid legislative purpose. This Office has recognized that the Department of Justice will not prosecute an executive branch official under section 192 for refusing to provide information to Congress in order to protect executive prerogatives. *See, e.g.*, *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, *13–14 (May 23, 2019); *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 101–02 (1984); *see also Prosecutorial Discretion Regarding Citations for Contempt of Congress*, 38 Op. O.L.C. __, *1 (June 16, 2014) ("[A] U.S. Attorney to whom a contempt of Congress citation is referred retains traditional prosecutorial discretion regardless of whether the contempt citation is related to an assertion of executive privilege.").

The same rationale applies to a determination that federal law does not authorize Treasury to share the President's tax information with the Committee. The Committee's power to conduct investigations is itself limited by the need for the inquiry to be in support of a legitimate legislative purpose. *See, e.g.*, *Watkins*, 354 U.S. at 187. Because the Committee's request lacked a legitimate legislative purpose and therefore exceeded its constitutional power of inquiry, Congress may not use its subpoena power to enforce an unconstitutional demand for information. The subpoenas were effectively null and void. And, given the lack of an applicable statutory exception, compliance with the subpoenas would have been prohibited by section 6103(a). Accordingly, the refusal by the Treasury officials to comply with the subpoenas did not violate 2 U.S.C. § 192.

## V.

For these reasons, we advised that the Committee's request for the President's tax information under 26 U.S.C. § 6103(f) should be denied. Congress could not constitutionally confer upon the Committee the right to compel disclosure by the Executive Branch of confidential information that did not serve a legitimate legislative purpose. While the Executive Branch should accord due deference and respect to congressional requests, Treasury was not obliged to accept the Committee's stated purpose without question, and based on all the facts and circumstances, we agreed that the Committee lacked a legitimate legislative purpose for its request. In the absence of such a legitimate purpose, 26 U.S.C. § 6103(a)

barred Treasury from disclosing the President's tax information in response to the Chairman's letter or the subsequent subpoenas.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*
